IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 21, 2005 Session

## STATE OF TENNESSEE v. MORRIS LAMONTE MARSH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-934     Cheryl Blackburn, Judge**

---

**No. M2004-00854-CCA-R3-CD _ Filed August 15, 2005**

---

The defendant, Morris Lamonte Marsh, was convicted of four counts of first degree felony murder, two counts of second degree murder, two counts of attempted second degree murder, and one count of aggravated assault. After merging two of the first degree felony murder convictions and the two second degree murder convictions into the first two felony murder convictions and merging the aggravated assault conviction into one of the attempted second degree murder convictions, the trial court ordered the defendant to serve a total effective sentence of two life sentences plus forty years. On appeal, the defendant raises the following issues: (1) whether the evidence was sufficient to support his convictions; (2) whether the trial court erred in instructing the jury on the law governing criminal responsibility; and (3) whether the trial court erred in sentencing the defendant. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Morris Marsh.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Brett Gunn and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

During the evening hours of May 17, 2000, several masked men broke into the home of Robert Harris, located on Flora Maxwell Road in Nashville, Tennessee. At the time of entry, Robert Harris, Tracy Perkins and her three children, Evita Hall, Sedrick Jones, and Tavares Jones were in

the home. Both Mr. Harris and Ms. Hall were shot and killed. Sedrick and Tavares Jones were shot and wounded.

Ms. Perkins testified that she was Mr. Harris' girlfriend. She and her three children lived with Mr. Harris at 224 Flora Maxwell Road. Around 11:30 p.m., she went to bed but awoke to a loud bumping noise coming from the living room. She opened her bedroom door to investigate the noise and saw her boyfriend and another man "scuffling." Ms. Perkins could not see the man's face but saw that he had a gun with a long barrel. Ms. Perkins went to the living room and saw a masked man armed with a gun. The masked man ordered her to get down on the floor. However, she ignored the order, walked into the kitchen, and hid in the laundry room. While hiding in the laundry room, she heard a shot. Ms. Perkins then ran out the back door of the house. While running, she heard more gunshots. She also saw a dark Cadillac with its engine running about "four houses up" from her house. While hiding outside, she saw the dark Cadillac back down the street then later come back up the street and turn the corner. After the police arrived, Ms. Perkins returned to the house and saw that the closets were emptied and the drawers pulled out. Ms. Perkins discovered that a couple of rings and a shotgun were missing from the house.

The former recorded testimony of Sedrick Jones, who was unavailable at the time of trial, was read into the record at trial. Sedrick Jones had previously testified at a suppression hearing and his testimony was subject to cross-examination by the defense counsel. Prior to the introduction of Sedrick Jones' former testimony, the trial court advised the jury that Sedrick Jones was unavailable due to the fact that he had an arrest warrant pending against him as a result of a probation violation on an attempted aggravated robbery charge. The trial court indicated that the jury could consider this information when assessing the credibility of Sedrick Jones' former testimony.

Sedrick Jones testified that on May 18, 2000, he was shot at 224 Flora Maxwell Road. According to Sedrick Jones, he opened the door of Mr. Harris' house and was about to leave when three men with guns appeared at the front door. The men had bandanas over their faces. With a gun to his stomach, Sedrick Jones was ordered back inside the house. Sedrick Jones testified that the masked men were there to rob them, asking, "[w]here the money's at?" One of the men reached into Sedrick Jones' pocket and took seven hundred dollars from him.

Sedrick Jones testified that at some point all three of the armed men took their masks off and he saw their faces. According to Sedrick Jones, the defendant took his cousin, Mr. Harris, into a room and killed him. The defendant then shot Tavares Jones. Sedrick Jones explained that as the men left the house, they shot him in the arm and leg and shot and killed a woman named Evita. Sedrick Jones stated that he believed the defendant to be the one who shot and killed Mr. Harris and who shot his brother because he recognized the "gold in his mouth." Sedrick Jones further stated that he later viewed a photograph of the defendant and identified him as the man who shot his brother.

On cross-examination, Sedrick Jones claimed that he saw the word "CRIP" etched in the defendant's gold teeth. He also stated that he saw the defendant's face as he was moving from room

to room in the house. Sedrick Jones denied using cocaine the evening he was shot. However, per stipulation, it was established that Sedrick Jones told police at the hospital that he had been drinking alcohol and using cocaine earlier that evening.

Tavares Jones, Sedrick Jones' brother, testified that he was visiting at Mr. Harris' house the evening of May 18, 2000. As he was about to leave the house, two armed men entered the house. The men told everyone to lie down on the living room floor. While lying on the floor, Tavares Jones heard "scuffling" and several gunshots. As the masked men walked over him, they shot him four times. After being shot, Tavares Jones heard Evita Hall praying, and then he heard the men shoot her. According to Tavares Jones, he could not identify the men because they were wearing bandanas over their faces. On cross-examination, Tavares Jones admitted to drinking and doing cocaine earlier that evening.

Several police officers testified that they responded to the shooting at 224 Flora Maxwell Road around 4:00 a.m. and began an investigation of the crime scene. At the crime scene, the officers interviewed Ms. Perkins, who explained her escape. Tavares Jones, Sedrick Jones, and Ms. Hall were transported by ambulance to the local hospital. Mr. Harris was determined to be dead. The officers observed blood stains on the floor, detected evidence of a struggle, and determined that the house had been ransacked. From the crime scene, the officers retrieved a total of twenty-three spent shell casings and eight bullet projectiles. The officers documented the crime scene by checking for fingerprints, taking pictures and measurements, drawing diagrams, and collecting evidence.

Police Officer Florentino Santana testified that around 4:45 p.m. on May 19, 2000, he was on patrol when he heard "very loud music" coming from a gray Cadillac driven by the defendant. As Officer Santana proceeded to follow the Cadillac, he observed the Cadillac run a stop sign. Officer Santana activated his blue lights as the defendant was making a left turn. While making the turn, Officer Santana observed the defendant throw a pistol out the window of the Cadillac. Officer David Goodwin, another officer following the defendant, recovered the pistol, a loaded Glock nine-millimeter. A short distance later, the defendant stopped the Cadillac and was placed under arrest. Officer Santana testified that after the defendant was arrested and booked, a pair of pants, a hat, a shirt, and a black bandana were collected from the defendant's person.

Police Detective Brad Putnam testified that he learned of the defendant's arrest and sought to interview him regarding the murders and attempted murders that occurred on Flora Maxwell Road the night before. Prior to the interview, Detective Putnam advised the defendant of his Miranda rights, and the defendant signed a waiver of rights form. During the interview, the defendant told Detective Putnam that he had met three other men in the Edgehill area. He and the other men talked about robbing a house where there was supposed to be $250,000 stashed in a closet and five kilos of cocaine buried under a doghouse in the backyard. The defendant drove the men to Flora Maxwell in his Cadillac because he did not let anybody drive his car. After parking up the street, the defendant loaned out his nine-millimeter Glock because "one of the guys needed a gun." The defendant then told Detective Putnam that the Glock was one of the murder weapons. The defendant

also explained that the three men who went inside the house were all armed and wearing bandanas – one man had a chrome gun, the other had a long gun, and the other one had his Glock.

According to Detective Putnam's testimony, the defendant admitted that he was expecting to get some of the proceeds from the robbery but claimed that his job was to drive the car. The defendant insisted that he stayed in the car during the robbery and did not go into the house. Nonetheless, the defendant stated that the men told him that Mr. Harris was shot because he grabbed for one of the guns, and Ms. Hall was shot because she would not stop singing "church songs." The defendant also admitted that he advised the men to shout "ATF Metro police" when entering the house. Detective Putnam testified that the defendant changed the names of the men during the interview, but later told Detective Putnam's partner the real names of the men involved in the robbery.

Detective Putnam testified that at some point during the middle of the interview he discovered that the interview was not being taped. Detective Putnam stopped the interview and turned on the audio/video recorder and continued the interview. Detective Putnam explained that the videotape contained only part of the interview. The videotape was played before the jury and admitted as an exhibit in the case.

Detective Putnam testified that after the interview, the defendant agreed to show him where the guns used during the robbery were hidden. Under police escort, the defendant directed Detective Putnam to his girlfriend's house. However, the guns were not at the house but were later recovered from a neighbor's house close by. Detective Putnam identified the recovered guns as a Cobray nine-millmeter submachine gun, a .223 caliber Ruger Mini 14, and a .45 caliber Commando Mark III submachine gun. All of the guns were loaded. Detective Putnam testified that the defendant indicated that the Cobray, Ruger Mini, and his Glock were the guns used in the robbery.

Detective Putnam testified that the next day he showed Sedrick Jones a photographic lineup that contained the defendant's picture. Looking at that lineup, Sedrick Jones was unable to make an identification. However, upon viewing additional photographs, Sedrick Jones saw a profile picture of the defendant and identified the defendant as the man who shot his brother. Sedrick Jones told Detective Putnam that he recognized the defendant as the shooter because of the defendant's prominent chin.

On cross-examination, Detective Putnam reiterated that Sedrick Jones mentioned the defendant's chin as the means of identification and stated that he did not recall if Sedrick Jones mentioned the defendant's gold teeth. Detective Putnam also admitted that another suspect had gold teeth in his mouth. Detective Putnam further admitted that Sedrick Jones did not specify which man he saw take the bandana off. Therefore, Detective Putnam stated that it was unclear whether Sedrick Jones saw the defendant's chin with the bandana off or noticed the defendant's chin under the bandana.

Detective Roy Dunaway testified that he was also present during the defendant's interview. Detective Dunaway stated that he and Detective Putnam provided some details about the robbery at Flora Maxwell Road, such as the street layout, and the defendant responded with details regarding where he parked his Cadillac and where he drove after the robbery. According to Detective Dunaway, the defendant's description of his driving corresponded to the layout of the Flora Maxwell neighborhood. Detective Dunaway also testified that the defendant gave him some real names of people involved in the robbery. On cross-examination, Detective Dunaway reiterated the fact that only part of the defendant's statement was taped. Detective Dunaway also acknowledged the fact that the defendant consistently denied going into the house on Flora Maxwell Road.

Several State witnesses testified regarding the physical evidence recovered during the investigation. No fingerprints were recovered from the guns used in the crime. Although fingerprints were taken from the defendant's Cadillac, none were matched to the defendant. However, a fingerprint was matched to another suspect who was being investigated. An autopsy of both Mr. Harris and Ms. Hall revealed that Mr. Harris and Ms. Hall died from multiple gunshot wounds. The autopsy also revealed the presence of alcohol and cocaine in Ms. Hall's system and the presence of cocaine in Mr. Harris' system. It was determined that one of the projectiles and two of the shell casings recovered from Mr. Harris at the crime scene had been fired from defendant's Glock. It was also determined that ten projectiles and twenty-one shell casings recovered from the crime scene had been fired from the Cobray.

Following the close of the State's proof, the defendant recalled Detective Putnam to the witness stand. Detective Putnam testified that he interviewed another suspect in the case named Ronald Dodson. Detective Putnam stated that although Dodson denied involvement, he admitted that he was the owner of the .223 Ruger and knew how many rounds were left in the gun. Detective Putnam also stated that Dodson told him that the defendant's Cadillac might have his fingerprints in it. The defendant did not testify.

Based upon the evidence presented, the jury found the defendant guilty of four counts of first degree felony murder; two counts of second degree murder; two counts of attempted second degree murder; and one count of aggravated assault. The trial court merged two of the first degree felony murder convictions and the two second degree murder convictions into the first two felony murder convictions. The trial court imposed a life sentence for each felony murder conviction. The trial court merged the aggravated assault conviction into one of the attempted second degree murder convictions, and imposed twenty year sentences for each of the attempted second degree murder convictions. The trial court then ordered all of the defendant's sentences to be served consecutively for a total aggregate sentence of two life sentences plus forty years.

## II. Analysis

### A. Sufficiency of the Evidence

The defendant first argues that the evidence was insufficient to support his convictions. Specifically, the defendant asserts that the evidence was insufficient because: (1) no physical evidence was found implicating him in the crimes that took place on 224 Flora Maxwell Road; and (2) the former testimony of Sedrick Jones identifying the defendant as a participant in the crimes was riddled with inconsistency and was not credible.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. Id.

Initially, we note that the defendant does not argue that the evidence was insufficient to prove the offenses for which he was convicted; but rather, the defendant maintains that the evidence was insufficient to establish his identity as a participant in the offenses for which he was convicted. However, the proof at trial established that the defendant was an active participant in the offenses.

The proof at trial established that a dark-colored Cadillac was parked outside the house on 224 Flora Maxwell Road. The next day, when the defendant was arrested, he was driving a gray Cadillac. Sedrick Jones, one of the victims, identified the defendant as the man who killed Robert Harris and shot Tavares Jones. The defendant was observed throwing his Glock nine-millimeter out of his Cadillac while being followed by police. One projectile bullet and two shell casings recovered from the body of Mr. Harris and the crime scene were fired from a Glock nine-millimeter. The men who shot the victims were described as wearing bandanas. A black bandana was collected from the defendant's person.

The defendant's own statements to police placed him at the crime scene. The defendant admitted that he and three men drove to a house on Flora Maxwell Road in order to steal an alleged hidden stash of cocaine and cash. The defendant further admitted that he expected to share in the proceeds of the robbery and told the other men to shout "ATF Metro police" when they entered the house. The defendant indicated that he knew the men were armed and wearing bananas and was

aware that two of the victims were shot and killed. The defendant identified his Glock as a murder weapon and told police that he loaned his Glock to one of the men. After making these statements, the defendant led the police to the other guns used in the shootings.

In this case, the jury was instructed on the law of criminal responsibility and found the defendant guilty of the aforementioned crimes. With respect to the defendant's argument regarding the lack of credibility and inconsistency of Sedrick Jones' testimony, we note that Sedrick Jones' inconsistent statements and credibility issues were either brought out on cross-examination or presented by stipulation. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find beyond a reasonable doubt that the defendant actively participated in the crimes for which he was convicted. Accordingly, the defendant's sufficiency arguments are without merit.

### B. Jury Instruction: Criminal Responsibility

The defendant argues that the trial court erred by twice instructing the jury on the law of criminal responsibility thereby giving undue emphasis to this portion of the instruction. We disagree.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. Id. In evaluating claims of error in the jury charge, this Court must review the charge in its entirety and read it as a whole. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). A charge shall be considered prejudicially erroneous if it fails to submit the legal issues fairly or if it misleads the jury as to the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Prior to reading the jury charge, the trial court made some "preliminary observations" about the charge to the jury. The trial court stated:

> [T]his is a very long charge. . . . [M]y preliminary remarks are not meant to emphasize any part of this charge. I want to make sure that that is important; by my trying to explain a couple of things, I don't want to emphasize any part of the charge over any other part. They are all equally important.
>
>           . . . .
>
> [T]here are some things that we didn't discuss or whatever. Some terms that are going to change or that you are going to notice as you read through the charge. One we talked about, and that is the criminal responsibility for conduct of another, and basically a defendant is criminally responsible for an offense committed by the

-7-

conduct of another if acting with the intent to promote or assist the commission of offense or to benefit in the proceeds or results of an offense, the defendant solicits, aids, directs, aids or attempts to aid another person to commit the offense.

That is what criminal responsibility for conduct of another. If you notice, it requires the person act with the intent to promote or assist the commission of the offense.

. . . .

. . . .

Now you will note on your verdict form, as you read through this [charge], that there is no specific check mark for someone being criminally responsible for the conduct of another. If you find that a person is criminally responsible for the conduct of another, they are convicted as if they were, it's the main offense.

The trial court also briefly remarked upon the meaning of facilitation, provided some explanation regarding the definitions of certain culpable mental states, and briefly outlined the basic framework of the verdict forms. The trial court stated, "[A]gain, nothing by what I have said [is] . . . meant to emphasize anything at all. Also, I . . . have no opinion as to what your verdict should be."

The trial court then read the entire charge to the jury. With respect to criminal responsibility, the charge read as follows:

The defendant is criminally responsible as a party to an offense if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of an offense, or to benefit in the proceeds or results of an offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense. Mere presence is not sufficient to find a defendant guilty for being criminally responsible for an offense committed by the conduct of another. However, presence of the defendant is not required.

A defendant who is criminally responsible for the commission of an offense is not only guilty of that offense, but is also guilty of any other offense committed by the conduct of another which is a natural and probable consequence of the offense originally intended. The issue is to be decided in the light of all the circumstances surrounding the incident. A "natural consequence" is one which is within the normal

-8-

range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. "Probable" means likely to happen.

Before you find a defendant guilty of being criminally responsible for said offense committed by the conduct of another, you must find the following:

1)      that all the essential elements of said offense have been proven by the state beyond a reasonable doubt;

2)      that the defendant was criminally responsible for the conduct of another.

With regard to the offense of Second Degree Murder and Attempted First Degree Premeditated Murder, you must also find:

3)      that the said offense that was committed was a natural and probable consequence of the crime of robbery and burglary. The Court will define for you the crime of robbery and burglary later in these instructions.

Upon review, we note that the defendant does not explain how the trial court's preliminary remarks prejudiced his trial other than his contention that the jury places more weight on statements that come from a trial court. Furthermore, the defendant does not cite relevant authority in support of his contention. Also, we note that the criminal responsibility portion of the jury charge corresponds to Tennessee Jury Pattern Instructions and closely follows the statutory definition set forth in Tennessee Code Annotated section 39-11-402. Looking at the trial court's preliminary comments, it is our view that the trial court was simply clarifying some difficult concepts and addressing preliminary issues regarding the charge.[1] The trial court carefully explained to the jury that these comments "were not meant to emphasize any part of [the jury] charge." It is good practice to make clear to the jury that repeated instruction should not be emphasized and should be considered in context of the entire charge. State v. Chance, 778 S.W.2d 457, 461-62 (Tenn. Crim. App. 1989). Finally, we note that the jury charge in this case fairly defined the issues of law and did not mislead the jury. Accordingly, we conclude that trial court did not err by commenting on criminal responsibility prior to reading the jury charge in its entirety. This issue is without merit.

## C. Sentencing

In challenging his sentences, the defendant argues that the trial court erred in enhancing his convictions for attempted second degree murder by improperly applying certain statutory

---

[1] Tennessee Rule of Criminal Procedure 30(d)(2) states in relevant part: "Jury instructions on the applicable law may be given before or after closing argument, in the court's discretion. All or part of such instructions given before closing argument may be repeated after closing argument. . . ."

enhancement factors in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).

Before a trial court sentences a convicted defendant, it must consider (1) the evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. Imfeld, 70 S.W.3d at 704-05.

Appellate review of a challenged sentence is a *de novo* review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

According to Tennessee sentencing statutes, the sentencing range for a Range II offender who commits a Class B felony is twelve to twenty years. Tenn. Code Ann. § 40-35-112(b)(2). In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the statutory minimum if there are no enhancement or mitigating factors. Id. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Id. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Id. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

At the sentencing hearing, the trial court found that the defendant qualified as a Range II, multiple offender, because he had two prior felony convictions. The trial court sentenced the defendant to two life sentences for his first degree felony murder convictions. With respect to the defendant's two convictions for attempted second degree murder, the trial court applied enhancement factors (2), that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (3), the defendant was a leader in the commission of an offense involving two or more criminal actors; (10), the defendant possessed or employed a firearm during the commission of the offense; and (14), the defendant was on bail for

-10-

an offense for which he was ultimately convicted. Id. § 40-35-114(2), (3), (10), and (14). The trial court also applied mitigating factor (10), the defendant assisted police officers in locating or recovering any property or person involved in the crime, but gave it little weight. Id. § 40-35-113(10). Consequently, the trial court sentenced the defendant to the maximum sentence of twenty years for each of his attempted second degree murder convictions and ordered these sentences to be served consecutively.

In Blakely, the United States Supreme Court held that the defendant's Sixth Amendment right to a jury trial was violated if a trial judge increased a defendant's sentence above the presumptive sentence based on facts not reflected in the jury's verdict or admitted by the defendant. See Blakely, 124 S. Ct. at 2537. However, our supreme court recently held that Tennessee's sentencing scheme constitutes a non-mandatory scheme which does not violate the Sixth Amendment right to a jury trial as interpreted by Blakely. State v. Gomez, 163 S.W.3d 632, 658-62 (Tenn. 2005). Accordingly, the defendant's reliance upon Blakely is misplaced, and he is not entitled to relief on this issue.

The defendant also argues that the trial court erred in imposing consecutive sentencing. The defendant argues that the trial court did not find that his sentences reasonably related to the severity of the offenses or that the lengthy incarceration was necessary to protect the public from further serious criminal conduct. The defendant contends that by virtue of his life sentence alone, he will be in his eighties before reaching parole eligibility.

As a general rule, a trial court may exercise its discretion and impose consecutive sentencing after considering one or more of the statutory criteria set forth in Tennessee Code Annotated section 40-35-115. Because these criteria are stated in the alternative, the trial court need only find one of the criteria present to support a determination of consecutive sentencing. However, if the trial court imposes consecutive sentencing based solely upon a finding that the defendant is a dangerous offender pursuant to Tennessee Code Annotated section 40-35-115(b)(4), the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see also Imfeld, 70 S.W.3d at 708.

The trial court imposed consecutive sentences based on Tennessee Code Annotated section 40-35-115(b)(4), the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. In finding the defendant to be a dangerous offender, the trial court stated:

> There were two people who were killed and two people left for dead. . . . [T]he victim, Ms. Hall, was killed basically either begging for life or because she was singing or because she was praying, one or the other. She was just shot in the head mainly because of that. . . . [T]his is a horrible crime. People in their homes, asleep, whatever reason, and to have this sort of home invasion and then people killed or left for dead under the circumstances.

-11-

Upon review of the record, we determine that the trial court considered the sentencing principles and all relevant facts and circumstances attendant to finding that the defendant qualified as a dangerous offender. While the <u>Wilkerson</u> factors were not expressly stated by the trial court, the violence of these offenses support a finding that the consecutive sentences imposed reasonably relate to these serious crimes and are necessary to protect the public from further criminal activity by the defendant. <u>See generally</u> Tenn. Code Ann. § 40-35-102. Accordingly, the defendant is not entitled to relief on this issue.

### III. Conclusion

Based upon our review of the record, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE